# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **EURONET PAYMENTS & REMITTANCE, INC.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 07-2216** |
| **v.** | ) | |
| | ) | |
| **ENVIOS DE VALORES LA NACIONAL CORP., ENVIOS DE VALORES LA NACIONAL, INC., AEROCARIBE TRAVEL AGENCY, INC., JOSÉ ANDRES HERNÁNDEZ ANDUJAR, CANDIDA DE HERNÁNDEZ AND ROBERTO LÓPEZ,** | ) ) ) ) ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO STAY ARBITRATION AND MOTION TO CONDUCT DISCOVERY PRIOR TO THE RULE 26(f) CONFERENCE

Defendants Envios de Valores La Nacional Corp., Envios de Valores La Nacional, Inc., AeroCaribe Travel Agency, Inc., José Andres Hernández Andujar, Candida De Hernández and Roberto López (the "Defendants") respectfully request that the Court deny the Plaintiff Euronet Payments & Remittance, Inc.'s ("Euronet") Motion to Stay Arbitration and Motion to Conduct Discovery Prior to the Rule 26(f) Conference, because: (1) all of Euronet's claims are included within the scope of the arbitration clause of the parties' Stock Purchase Agreement ("SPA"), (2) under the Federal Arbitration Act ("FAA") and the terms of the SPA, the issue of the validity of the arbitration clause is reserved for the arbitrator; and (3) even if the validity of the arbitration clause were governed by New York law, Euronet has failed to substantiate any claim that the arbitration clause is invalid.

## PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT

Despite signing an SPA with a broad arbitration clause, Euronet once again attempts to evade its contractual obligations.  Euronet has asserted multiple conclusory allegations of fraud which it claims should release it from its obligation to arbitrate.  However, both the FAA and the terms of the SPA provide that the issue of the validity of the arbitration clause, even in the light of the fraud allegations made by Euronet, is reserved for the arbitrator.  Moreover, even if New York law were applied to determine the validity of the arbitration agreement, Euronet's vague allegations would still fall far short.  None of Euronet's fraud allegations even meet the requirements of Federal Rule of Civil Procedure 9(b) which requires fraud to be pled with particularity, let alone provide the "clear and convincing" prima facie case necessary under New York law to invalidate the SPA as a whole.

None of Euronet's allegations even support a fraud claim because the information that was allegedly hidden from or misrepresented to Euronet was either unknown to the Defendants or available to Euronet prior to the execution of the SPA:

- The arrest of two La Nacional employees: this information was unknown to Defendants until the time of the arrest, which was after the SPA was signed. Defendants were unaware of the investigation until the arrests occurred, and none of the Defendant corporations were the target of the investigation or have been accused of any wrong doing.

- Ramon Corporán: Mr. Corporán's prior criminal record was included in his personnel file which was available to Euronet during the due diligence phase of the SPA.  Only one state, Delaware, required disclosure of Mr. Corporán criminal record.  Defendants have amended their regulatory filings in Delaware to reflect

the criminal record, and Delaware has not taken any adverse action against Defendants.

- Other employees previously employed by RAO: The personnel files of all employees were available to Euronet during due diligence.  None of these employees was accused of any wrongdoing while working for RAO, and Euronet does not allege that they were involved in any wrongdoing either while at RAO or while working for the Defendant companies.

- Alleged conspiracy to strip business: Euronet provides no information about the alleged conspiracy or who was involved, and these claims are have no factual support.

Indeed, Defendants, in a series of letters, directly addressed these claims and stated to Euronet that they had lacked the information or reminded Euronet of the fact that it had access to this information before it signed the SPA.

Euronet has not disputed the existence of the SPA's arbitration agreement nor has it asserted that its claims are not included within in the scope of the SPA's arbitration clause.[1]  In the instant case, the only issues for the Court are whether an arbitration agreement exists and whether the dispute at issue is within the scope of that agreement.  As the answer to each inquiry is an undisputed "yes," all other issues are reserved for the arbitrator.  Therefore, Euronet's Motion to Stay Arbitration and Motion to Conduct Discovery must be denied, and all of its claims, including its request to conduct discovery, referred to arbitration.

---

[1] Euronet has, however, asserted that its claims against Roberto López are not subject to arbitration merely because he was not a signatory to the SPA. Memo. Of Law in Support of Plft's Motion to Stay Arbitration at p. 15.  For the reasons detailed in Defendants' Motion for Stay to Enforce Arbitration Provision, pp. 9-12, which are expressly incorporated herein, Euronet's claims against Mr. López must also be arbitrated because they are inextricably intertwined with the SPA, and rely upon the SPA such that failure to require arbitration of those claims would eviscerate the SPA's arbitration provision.  Euronet has offered no contrary authority to that provided in Defendants' Motion for Stay to Enforce Arbitration Provision.

**ARGUMENT AND CITATION OF AUTHORITY**

I.    **Under The FAA And The Terms Of The SPA, The Issue Of The Validity Of The Arbitration Clause Is Reserved For the Arbitrator.**

Euronet, citing <u>Volt Information Sciences, Inc. v. Bd. Of Trustees of Stanford University</u>, 489 U.S. 468 (1989), has asserted in its Memorandum of Law in Support of its Motion to Stay Arbitration (<u>see</u> p. 8), that the SPA's New York choice of law provision requires the Court to apply New York law to determine whether a court or an arbitrator decides the validity of the parties' arbitration agreement.  However, Euronet's citation is not controlling.  <u>Volt</u> has been limited in its application and current law, as well as the SPA's terms, require that the fraud issues raised by Euronet be reserved for the arbitrator.

A.    **The SPA's New York Choice Of Law Provision Does Not Make The Issue Of The Arbitration Agreement's Validity An Issue For The Court.**

When, as in the instant case, the parties' agreement is subject to the FAA,[2] "the presumption is that the arbitrator should decide  "'allegation[s] of waiver, delay, or a like defense to arbitrability.'  Questions concerning 'whether perquisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met' are [generally] for the arbitrators to decide.'"  <u>Diamond Waterproofing Systems, Inc. v. 55 Liberty Owners Corp.</u>, 826 N.E.2d 802, 805 (NY 2005) (citations omitted).  While parties may, through a choice of law provision, agree to have determination of these types of issues governed by state law, they have to expressly so state.

> It is well settled that where parties broadly agree to arbitrate any controversy arising from their contract, they may - as with any contract - add qualifications to that clause by providing that New York law will govern the agreement and its enforcement.  A choice of law provision,

---

[2] Euronet does not deny that the SPA is a transaction involving "commerce" as defined in 9 U.S.C. § 1, and thus is subject to the FAA.  It has merely alleged that New York law, instead of the FAA, determines whether a court or an arbitrator will decide the validity of the SPA's arbitration agreement.  <u>See</u> Plft's Memorandum of Law in Support of its Motion to Stay Arbitration at p. 8.

> which states that New York law shall govern both the agreement *and its enforcement* adopts as binding New York's rule that threshold Statute of Limitations questions are for the courts.  In the absence of more critical language concerning enforcement, however, all controversies . . . are subjects for arbitration.

Id. at 806 (citations omitted) (emphasis in original).  Unless the choice of law provision specifies that the "agreement *and its enforcement*" will be governed by New York law, the arbitrator decides defenses to arbitrability, not the courts.

> The SPA's choice of law provision states:

> THIS AGREEMENT WILL BE DEEMED TO BE A CONTRACT MADE UNDER THE LAWS OF THE STATE OF NEW YORK AND FOR ALL PURPOSES WILL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS PREVAILING IN THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS.

SPA, ¶ 11.5, p. 49.  The SPA does not state that it and "its enforcement" will be governed by New York law.  Without such language, the FAA, not CPLR Article 75, asserted by Euronet, determines who decides threshold issues of arbitrability.  Diamond Waterproofing Systems, Inc., 826 N.E.2d at 805 (NY 2005); see also Nomura Securities Int'l, Inc. v. CIBC World Markets Corp., 798 N.Y.S.2d 879, 884 (2005) ("Given the parties' decision to arbitrate any controversy arising out of their business relationship . . . and the absence of an express choice-of-law provision that New York law governs the enforcement of the agreement to arbitrate, petitioner has failed to overcome the presumption that the arbitrator is to determine the timeliness issues.").

### B.   Under The FAA, Issues Of Fraud In The Inducement Are Reserved For The Arbitrator.

Under the FAA, it is well settled that alleged fraud in the inducement in the making of a contract – unless the fraud goes to the agreement to arbitrate itself – is an issue for the arbitrator and not a court.  Bar-Ayal v. Time Warner Cable, Inc., No. 03CV9905KMW, 2006 WL 2990032,

* 6 (S.D.N.Y. Oct. 16, 2006) ("[W]here a party challenges the *validity of a contract* (that

includes an arbitration provision) *as a whole* [and listing fraud in the inducement as a challenge

to a contract's validity]– rather than the validity of the arbitrator provision itself, or a separate

arbitration agreement – the arbitrator must decide that issue.  [Citations Omitted.]" (emphasis in

original)).  As stated by the United States Supreme Court forty years ago:

> [I]f the claim is fraud in the inducement of the arbitration clause itself –
> an issue which goes to the 'making' of the agreement to arbitrate – the
> federal court may proceed to adjudicate it .  But the statutory language
> does not permit the federal court to consider the claims of fraud in the
> inducement of the contract generally . . . .  We hold, therefore, that in
> passing upon a § 3 application for a stay while the parties arbitrate, a
> federal court may consider only issues relating to the making and
> performance of the agreement to arbitrate.

Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403-404 (1967).  The Prima Paint

Corp. decision established the principle that arbitration clauses are severable from the contracts

in which they are contained, and alleged fraud in the inducement of the contract in general will

not invalidate the arbitration clause.  Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co., 263 F.3d

26, 31 (2d Cir. 2001) ("Arbitration clauses as a matter of federal law are 'separable' from the

contracts in which they are embedded, and that where no claim is made that fraud was directed to

the arbitration clauses itself, a broad arbitration clause will be held to encompass arbitration of

the claim that the contract itself was induced by fraud." (quoting Prima Paint Corp., 388 U.S. at

402).); see also Denny v. BDO Seidman, LLP, 412 F.3d 58, 67 (2d Cir. 2005) ("'[A] party

merely alleg[ing] that a contract is voidable,' who does not further allege that the arbitration

clause itself is voidable, will be compelled to arbitrate the dispute." (quoting Sphere Drake Ins.,

263 F.3d at 31)).

      Euronet has not alleged that the SPA's arbitration clause was procured by fraud, but has

instead claimed fraud in the inducement to the entire SPA.  As such, even if Euronet were able to

make a showing that the SPA was fraudulently induced, it would still be required to pursue those claims through arbitration and not before this Court.

### C.   The SPA Itself Reserves Issues Of Arbitrability For The Arbitrator.

The SPA's arbitration clause states that arbitration "shall be conducted in accordance with the Commercial Arbitration Rules and Mediation Procedures of the American Arbitration Association (the "AAA") as amended by this Section 11.4."  SPA, ¶ 11.4 pp. 48-49.  Rule 1 of the AAA Commercial Arbitration Rules states in part:

> The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association (hereinafter AAA) under its Commercial Arbitration Rules . . . ."

AAA, Commercial Arbitration Rules, R-1 (Agreement of Parties).  Thus, the parties agreed that AAA's Commercial Rules were incorporated as part of the SPA's arbitration provision.

Rule 7 of AAA's Commercial Arbitration Rules further specifies:

> (a)      The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.
>
> (b)      The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part.  Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract.  A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

AAA, Commercial Arbitration Rules, R-7 (Jurisdiction).  Therefore, in executing the SPA, Euronet agreed that an arbitrator would have the jurisdiction to rule on the validity of the SPA, including the jurisdiction to rule on the type of fraud claims that Euronet now asserts.  Contec Corp. v. Remote Solution Co., Ltd., 398 F.3d 205, 208 (2d Cir. 2005) (holding that an arbitration clause which provided that arbitration would be held "in accordance with the Commercial

Arbitration Rules of the American Arbitration Association" was "clear and unmistakable evidence of the parties' intent to delegate ["objections with respect to the existence, scope or validity of the arbitration agreement"] to an arbitrator"); Bar-Ayal, 2006 WL 2990032 at * 7 ("The Court concludes that the arbitration provision at issue here, both in its explicit language and its incorporation of the AAA's Commercial Arbitration Rules, constitutes sufficiently clear and unmistakable evidence that the parties intended to have issues of arbitrability decided by the arbitrator.").

Therefore, both federal law and the SPA require that Euronet's claims, including their claims of fraud in the inducement of the SPA are reserved for the arbitrator.  However, as explained below, even without the clear federal and contractual mandate that the issues raised by Euronet must be referred to arbitration, an analysis under New York law would likewise require that Euronet's fraud allegations must be decided by an arbitrator.

**II.    Even Under New York Law, Euronet's Claims Must Be Referred To Arbitration.**

    **A.    Under New York Law The Court May Only Decide Whether The Agreement To Arbitrate In The SPA Is Valid.**

"[A]rbitration is strongly favored under New York law."  Matter of Pinson, 2006 N.Y. Slip Op. 51685U, *4, 824 N.Y.S.2d 758 (Sup. Ct., Kings Co. 2006) (quoting Matter of Nationwide Gen. Ins. Co. v. Investors Ins. Co. of Am., 332 N.E.2d 333, 335 (NY 1975)).  When a party attempts to stay arbitration, courts may only decide three limited threshold issues: (1) whether a valid agreement to arbitrate exists; (2) whether the parties have complied with the agreement to arbitrate; and (3) whether the claim sought to be arbitrated is barred by the statute of limitations.  See CPLR 7503(b); David Siegel, N.Y. Prac. § 589 at 1034-35 (4th ed. 2007); 1 N.Y. Civ. Prac. CPLR 7503.04 (2006).  All other issues are reserved for the arbitrator.

A court decides only whether there is a substantial issue as to any of these threshold questions regarding the agreement to arbitrate.  1 N.Y. Civ. Prac. CPLR P 7503.04.  If no such substantial issue is found, the court will order arbitration.  Id.; see also CPLR 7503(a) ("[w]here there is no substantial question whether a valid agreement was made or complied with . . . the court shall direct the parties to arbitrate").  Contrary to what Euronet asks this Court to do, New York courts will not decide the merits of the underlying controversy when determining whether the dispute is arbitrable.  CPLR § 7501.  "As a general matter the role of the courts in the presence of a broad arbitration clause is limited to determining whether there is a 'reasonable relationship between the dispute and the general subject matter of the underlying contract.'" 1 N.Y. Prac. CPLR P 7501.20 (quoting Nationwide Gen. Ins. Co., 332 N.E.2d 333).  Therefore, the only issues for the Court are whether a valid arbitration clause exists, whether Euronet and the Defendants complied with any conditions precedent to arbitration, and whether arbitration was timely sought.

Euronet has not denied the existence of the SPA's arbitration clause, nor alleged that the arbitration clause was improperly invoked, or that Defendants' request that the parties arbitrate the disputes raised in Euronet's complaint was untimely.  Thus, the single issue before the Court is whether the SPA's arbitration clause is valid.  As explained below, Euronet's vague allegations of fraud are insufficient to invalidate the SPA's arbitration requirement.

### B.     There Is No Evidence That The SPA's Arbitration Clause Itself Was Induced By Fraud.

When a party alleges that an arbitration clause is invalid on account of fraud, the court's inquiry is limited to "whether the arbitration clause itself was induced by fraud."  Tong v. S.A.C. Capital Mgmt., LLC, No. 10050/2007, 2007 WL 1462246,  N.Y. Slip Op. 27200, *6, (Sup. Ct.,

N.Y. Co. May 17, 2007) (quoting <u>Zurich Ins. Co. v. R. Elec., Inc.</u>, 5 A.D.3d 338, 339, 773

N.Y.S.2d 560 (1st Dept. 2004)).  As Professor David Siegel explained:

> The doctrine's theory is that whatever the motivations that led the party to make this bargain, the one item in the contract to which the party subscribed with eyes open is its arbitration clause.  Thus, unless the fraudulent inducement can be demonstrated to touch the arbitration clause itself, the party's agreement to arbitrate will be deemed voluntary, sufficing to turn all the rest of the case over to the arbitrator—including the charge of fraud in respect of all the rest of the contract.  To that extent the arbitration provision of the contract is "separable".  If, when so separated, the inducement charge cannot be shown to touch it directly, the party is remitted to the arbitrator for any other plaints under the contract.  The "valid agreement" whose making CPLR 7503(a) authorizes the court to determine has construed, in short, to mean "a valid agreement to arbitrate".  By segregating the arbitration provision and testing its validity independently, it can be deemed valid "even if the substantive portions of the contract were induced by fraud".
>
> N.Y. Prac. § 589 at 1034-35 (quoting <u>Weinrott v. Carp.</u>, 32 N.Y.2d 190, 198 (1973)

(Emphasis added.)  "Fraud inducing a contract containing an arbitration clause does not vitiate

the contract; it merely constitutes a ground for avoiding the contract.  If issues with regard to

alleged fraud or misrepresentation are within the scope of an arbitration clause and the clause

itself is not rendered invalid or voidable by reason of the alleged fraud or misrepresentation, the

issues are to be submitted to and determined by the arbitrators."  <u>Housekeeper v. Lourie</u>, 39

A.D.2d 280, 282, 333 N.Y.S.2d 932 (1st Dept. 1972).

Nothing in Euronet's amended complaint or Motion for Stay of Arbitration alleges

fraudulent inducement as to the arbitration clause itself.  Instead, Euronet alleges fraudulent

inducement as to the entire SPA.  Because there is not even an allegation that the arbitration

clause of the SPA was fraudulently induced, New York law recognizes that Euronet has agreed

to arbitrate disputes within the scope of the arbitration clause, and Euronet's claims must be

referred to arbitration.

### C. Euronet Has Failed To Establish With Clear And Convincing Evidence That The SPA Was Permeated With Fraud.

When an arbitration clause covers claims of fraud, as in the instant case, a party attempting to circumvent arbitration has the burden to present "clear and convincing proof of permeation with fraud (in the agreement) such as would invalidate the entire agreement." Shmulevich v. Bederoff, No. 23188/04, 2007 WL 474226, N.Y. Slip Op. 50226U, *4, (N.Y. Sup. Feb. 13, 2007) (emphasis supplied). "[B]are conclusory assertions [are] insufficient to demonstrate that 'the alleged fraud was part of a grand scheme that permeated the entire contract including the arbitration provision.'" Stellmack Air Conditioning & Refrigeration Corp. v. Contractors Mgmt Sys. of NH, Inc., 293 A.D.2d 956, 956-57, (3d Dept. 2002) (rejecting plaintiff's bare assertions that numerous flawed operations in licensed software established fraud that permeated entire licensing agreement when contract contained a broad arbitration clause); Pinson, 2006 N.Y. Slip Op. 51685U at *8, 824 N.Y.S.2d 758 (rejecting plaintiff's allegations of fraudulent inducement when plaintiff admitted he signed the arbitration agreement, but failed to offer any evidence other than "self-suffering, conclusory allegations"). In the absence of facts demonstrating clear and convincing proof that a contract was permeated by fraud, the question of fraudulent inducement is reserved for the arbitrator. See Avalon Int'l Trading Corp. v. GST Receivables Mgmt Corp., 220 A.D.2d 248, 249 632 N.Y.S.2d 95 (1st Dept. 1995) (staying action pending completion of arbitration).

In the instant case, Euronet's allegations of fraud do not satisfy the "clear and convincing" standard. First, Euronet's fraud allegations do not even comply with Federal Rule of Civil Procedure 9(b)'s requirement that fraud be pled with particularity. Second, and more importantly, when placed in the actual context of the parties' dealings, Euronet's allegations, do not even substantiate a cause of action for fraud.

    **1.**    **Euronet's Allegations Do No Satisfy Fed. R. Civ. P. 9(b)'s Requirement That Fraud Be Pled With Particularity.**

Federal Rule of Civil Procedure 9(b) requires a party asserting fraud to plead "the circumstances constituting fraud . . . with particularity."  "Simply stated, Rule 9(b) requires the party claiming fraud to set forth 'the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'"  Ramada Franchise Sys., Inc. v. Tresprop, Ltd., 188 F.R.D. 610, 616 (D. Kan. 1999).  The plaintiff's allegations of fraud must provide the defendant with fair notice of the claims and the factual background upon which such claims are based.  Id.

In order to meet Rule 9(b)'s heightened pleading requirement, a party alleging fraud must identify the "'who, what, where, and when' of [the] alleged fraud."  Id. at 616-17.  For example, in Tresprop, the defendants' counterclaim for fraudulent inducement did not allege the identity of the person who made the alleged misrepresentation, the time of the misrepresentation, or the place of the misrepresentation.  Id. at 617.  Because the defendants' mere averment that plaintiff made a misrepresentation failed to meet Rule 9(b)'s heightened pleading requirement to identify the who, where, or when of the alleged fraud, the court sustained the plaintiff's motion to dismiss the defendants' counterclaim for failure to plead fraud with particularity.  Id.  Similarly, in the instant case, Euronet has failed to allege all the who, what, where and when.  See Compl. ¶ 54 ("During the negotiations related to the SPA, Defendants intentionally and knowingly omitted and/or made false statements to Euronet about material facts . . . .").  Euronet generically alleges that "Defendants" made "false statements" on several topics "[d]uring negotiations related to the SPA," however, there is no detail of exactly what was said, who allegedly said them, i.e., which Defendant allegedly made the misrepresentation, or where or exactly when during the lengthy period of the SPA's negotiations the statement was allegedly made.  Euronet's description does

not provide the Defendants with fair notice of the claims and factual background upon which Euronet alleges fraudulent inducement.

In addition, when fraud is alleged against multiple defendants, the party alleging fraud must separately set forth the acts of alleged fraud by each defendant to satisfy Rule 9(b)'s pleading requirements.  See Regal Ware, Inc. v. Vita Craft  Corp., No. 06-2161-JWL, 2006 U.S. Dist. LEXIS 68104, *17-18 (D. Kan. Sept. 19, 2006) (By failing to "identify the particular individual or individuals [defendants] who made the misrepresentations," and by failing to allege specific dates or locations where the alleged misrepresentations were made, the plaintiff did not sufficiently plead fraud with particularity under Rule 9(b)).  In the instant case, Euronet's complaint merely alleges "Defendants" or "multiple La Nacional employees" made alleged misrepresentations regarding the SPA.  Compl. ¶¶ 24, 54-59.  This case involves three corporate Defendants ("La Nacional" Defendants) and three individual Defendants.  Euronet's generic identification of "Defendants" and "multiple [and unnamed] La Nacional employees" fails to identify the particular individual or individuals who made the alleged misrepresentations.  Accordingly, Euronet's allegations of fraudulent inducement do not meet Rule 9(b)'s particularity requirement.

## 2.     Euronet's Allegations Fail To Establish Even A Prima Facie Case Of Fraud.

As explained above, Euronet's vague and rambling allegations would be subject to dismissal for failure to comply with Federal Rule of Civil Procedure 9(b).  Furthermore, when put in the actual context of the parties' dealings, Euronet's claims would fail to establish a prima facie fraud claim, much less clear and convincing evidence.

To establish fraud under New York law, a plaintiff must allege:  (1) representation of a material fact, (2) falsity, (3) scienter, (4) deception, and (5) injury.  See Tong, 2007 WL 1462246,

N.Y. Slip Op. 27200 at *6.  Furthermore, as explained above, in order to question the validity of the SPA's arbitration clause, Euronet would have to demonstrate "clear and convincing proof of permeation with fraud (in the agreement) such as would invalidate the entire agreement." Shmulevich, 2007 WL 474266, N.Y. Slip Op. 50226U, *4.  This Euronet has failed to do.

Euronet's allegations fail to establish falsity, scienter or deception.  Moreover, prior to Euronet filing the instant action, Euronet and La Nacional exchanged a series of letters discussing and explaining the allegations raised by Euronet.  These letters reveal that the information allegedly concealed from Euronet was either unknown to Defendants at the time the SPA was signed, was fully available to Euronet prior to its execution of the SPA, or appear to be made without any factual basis.  Despite being told that its allegations were ill-founded, Euronet has persisted in making baseless fraud allegations to this Court and others[3] in the apparent hope that endless repetition of conclusory allegations will somehow make them true and allow Euronet evade the arbitration provision to which it agreed.

Euronet's fraud claims rely on assertions that (1) Defendants falsely represented that the La Nacional companies were lawfully operated and this is not true because two La Nacional employees were arrested for money laundering, Compl. ¶¶ 23, 26-29; (2) La Nacional employee Ramon Corporán was once convicted of money laundering, and (a) his prior conviction was hidden from Euronet, Compl. ¶¶ 30-32, and (b) Defendants failed to reveal his prior conviction to regulatory authorities endangering La National's operating licenses, Compl. ¶¶ 36-37 ; and (3) La Nacional employs individuals who previously worked for a company named RAO which had been convicted of money laundering, even though the individuals were never accused of any

---

[3] In addition to filing a Motion to Stay Arbitration before this Court, Euronet has filed a Petition before the Supreme Court of New York County making substantially identical allegations and seeking substantially similar relief.  See Euronet's 5/18/2007 "Verified Petition to Stay Arbitration," Supreme Court of New York, New York County, Index 601675/07 (Exhibit 1).

wrong doing and Euronet accuses them of no wrong-doing, Compl. ¶¶ 34-35; and (4) José Hernández and Roberto López conspired to strip business away from the La Nacional companies after the closing of the SPA, Compl. ¶¶ 42-47.

First, with regard to the two La Nacional employees were who were arrested, until the time of the arrest, which was after the SPA was signed, Defendants were unaware of the federal investigation or the employees' misconduct.[4]  Following the arrest of these two employees, Defendants sent Euronet a letter explaining that it learned of the arrests only after they occurred, and that La Nacional had terminated the employees at issue and had taken actions to prevent misconduct by other employees.  See 2/14/07 letter to Eric Mettemeyer at p. 2 (Exhibit 2) ("Envios NY learned of the arrests at approximately 6:00 PM [on February 6, 2006 – the day of the arrests]" and did not receive copies of the search warrants or supporting affidavit until February 7, 2007.).  In fact, through a series of letters, Defendants kept Euronet apprised of the status of the investigation.  See 3/6/2007 letter to Eric Mettemeyer at p. 3 (Exhibit 3) ("It appears from such requests that Euronet is of the opinion that Envios NY knew of the alleged money laundering transactions as well of the investigations.  However, Envios NY learned of such events when it received copies of the search warrants and affidavits in support of the arrest and search warrant of both former employees."); 3/26/2007 letter to Eric Mettemeyer (Exhibit 4) (discussing communications between's La Nacional counsel and the Assistant United States Attorney leading the investigation that led to the arrest of the two La Nacional employees).  As was repeatedly explained to Euronet before it filed this action, the culmination of the Government's investigation is that La Nacional itself was not the target of the investigation and

---

[4] The SPA was signed on January 12, 2007, and the two employees were not arrested until February 6, 2007.  See Compl. ¶ 1 (January 12, 2007 Stock Purchase Agreement) and ¶ 2 (employees arrested on February 6, 2007).

has not been implicated by authorities in money laundering.  3/6/2007 letter to Eric Mettemeyer at p. 3 (Exhibit 3) ("only the two former employees arrested were the targets of the prosecutors and not the Companies"); 3/26/2007 letter to Eric Mettemeyer (Exhibit 4) ("As is clear from the statements from Ms. Klapper [the federal prosecutor], La Nacional neither is a subject nor target of any investigation concerning money laundering related to the February arrests, nor in fact has it ever been.").

Second, as for Ramon Corporán, Defendants did not hide his prior 1998 conviction.  Mr. Corporán's personnel file, including information regarding his prior conviction, was available to Euronet during the due diligence phase of the SPA.[5]  Counsel for the Defendants even pointed out this fact to Euronet in a March 6, 2007 letter.

> You asked in your letter why Mr. Corporán's criminal conviction was not provided to Euronet during its due diligence.  La Nacional, however, did not conceal any information about Mr. Corporán (or any of its employees) during Euronet's due diligence review.  As you know, Euronet was allowed access to all files while its representatives visited Envios NY's offices for due diligence review and was also allowed to ask questions after this on-site due diligence review.  It was Euronet who reported to Mr. Hernández when its due diligence review was completed and proceeded to prepare the SPA by the deadline set forth in the Term Sheet executed by the parties.  The nature and thoroughness of [the] review Euronet conducted during this time was up to Euronet – Mr. Corporán's file was available for review.  Had Euronet's representative reviewed such file or looked through it carefully, Euronet would have learned of the criminal conviction of Mr. Corporán then.

3/6/2007 letter to Eric Mettemeyer at pp. 6-7 (Exhibit 3).  Thus, not only was the information concerning Mr. Corporán's prior conviction available to Euronet before it signed the SPA, despite being told that this information had been available to it, Euronet has persisted in representing to the Court that this information was hidden from it.

---

[5] Interestingly, as part of the transaction memorialized in the SPA, Euronet actually offered Ramon Corporán a retention bonus to stay with the La Nacional companies after the closing of the SPA.  See 1/14/2007 Retention Bonus Agreement (Exhibit 5).

Nor has any alleged failure to disclose Mr. Corporán's prior conviction to regulators endangered La Nacional's licenses.  In fact, most states in which La Nacional operates do not require such disclosure.  See 3/6/2007 letter to Eric Mettemeyer at p. 7 (Exhibit 3) ("After an analysis of the applicable regulations by Envios NY's regulatory counsel performed after we received your letter, it has been concluded that only the State of Delaware requires disclosure of Mr. Corporán's criminal record in their license application.  Envios NY plans to promptly contact the banking department in Delaware to provide this information.").  After Euronet expressed concern, La Nacional amended its filings in Delaware to reflect Mr. Corporán's prior conviction.[6]  Since that time, Delaware has not taken any adverse action regarding La Nacional's operating license.

Third, Euronet's claim that La Nacional employs various individuals who once worked for RAO is hardly a basis for fraud.  First, the personnel files of all of these individuals were available to Euronet during the due diligence phase, and Euronet was advised of this fact before it ever filed suit.  See 3/6/2007 letter to Eric Mettemeyer at p. 7 (Exhibit 3) (noting that all employee files were available to Euronet during due diligence).  Furthermore, Euronet does not even allege that any of these individuals was ever accused, let alone convicted of any wrongdoing in connection with their employment with RAO.  Not only was their former association with RAO never hidden, that association, in and of itself involved no fraud and is not evidence of any fraud.

Fourth, Euronet's claims that Mr. Hernández and Mr. López and unnamed "others [conspired] to strip business away from La Nacional following the Closing of the SPA," (Compl.

---

[6] See 3/26/2007 letter and Amended Renewal Application, amended response to Question 10, ("Mr. Corporan is an employee in the company's sales department.  Mr. Corporan was hired by the company on February 14, 2003.  Mr. Corporan was arrested on July 31, 1996 and later pled guilty on February 25, 1998, to one federal felony count of conspiracy to commit money laundering. . . .  Mr. Corporan was hired only after discussions with his parole officer to confirm his good behavior."  (Exhibit 6)).

¶ 97), is simply baseless.  Euronet offers absolutely no detail about this alleged conspiracy despite claiming that it has "information from multiple sources."  Plft's Motion to Stay Arbitration at p. 14.  This complete lack of detail is insufficient to satisfy Federal Rule of Civil Procedure 9(b)'s requirement that fraud be plead with particularity or the requirement that Euronet establish fraud by clear and convincing evidence.  Defendants simply have no idea on what "facts" Euronet bases these claims.

As detailed above, none of Euronet's allegations support the essential elements of a fraud claim, let alone establish fraud by "clear and convincing" evidence.  In fact, Euronet's fraud claims are vague and conclusory and would be subject to dismissal under Federal Rule of Civil Procedure 9(b).  Thus, Euronet has failed to offer any reason to invalidate the SPA or its arbitration clause.

**III.    Euronet's Motion To Conduct Discovery Prior to the Rule 26(f) Conference Must Be Denied.**

As explained above, all of Euronet's claims, including their claims for fraud in the inducement must be referred to arbitration.  Pursuant to 9 U.S.C. § 3, when claims are subject to arbitration, "the court in which the suit is pending . . . **shall on application of one of the parties stay trial of the action until such arbitration has been had** in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration."  (Emphasis added.)  This stay requirement includes discovery.  Corpman v. Prudential-Bache Securities, Inc., 907 F.2d 29,31 (3rd Cir. 1990) (stay requirement includes discovery).  Therefore, the Court should deny Euronet's Motion to Conduct Discovery Prior to The Rule 26(f) Conference.

**IV.      Conclusion**

For the reasons described above, Defendants respectfully request that the Court deny

Euronet's Motion to Stay Arbitration and Motion to Conduct Discovery Prior to the Rule 26(f)

Conference, and grant Defendants' previously filed Motion for Stay to Enforce Arbitration

Provision.

Dated: June 11, 2007.

/s/ Russell S. Jones, Jr.
RUSSELL S. JONES, JR.      KS Fed. #70214
TRAVIS L. SALMON          KS      #20606
Shughart Thomson & Kilroy, P.C.
120 W. 12th Street
Kansas City, Missouri  64104
rjones@stklaw.com
tsalmon@stklaw.com
telephone:  816-421-3355
facsimile:   816-374-0509

*Attorneys for Defendants*
*Envios de Valores La Nacional Corp., Envios*
*de Valores La Nacional, Inc., AeroCaribe*
*Travel Agency, Inc., José Andres Hernández*
*Andujar and Candida De Hernandez*

Of Counsel:
G. Lee Garrett, Jr.
GA # 286519
L. Christine Lawson
GA# 440404
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309
Telephone: (404) 521-3939
Fax: (404) 581-8330

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of June, 2007, I have electronically filed the foregoing DEFENDANT ROBERTO LÓPEZ'S CONSENT TO REMOVAL AND JOINDER IN DEFENDANTS' MOTION FOR STAY TO ENFORCE ARBITRATION PROVISION with the Clerk of Court using the CM/ECF system, which automatically serves notification of such filing to the following counsel of record:

> William M. Modrcin
> wmodrcin@stinson.com
> George F. Verschelden
> gverscheldon@stinson.com
> Stinson Morrison Hecker LLP
> 1201 Walnut Street
> Kansas City, Missouri 64106

I HEREBY CERTIFY that I have also served the following non electronic filing users by United States mail, with adequate postage attached thereto, addressed as follows:

> Thomas S. Kilbane
> Howard J.C. Nicols
> Colin R. Jennings
> Squire, Sanders & Dempsey L.L.P
> 4900 Key Tower
> 127 Public Square
> Cleveland, Ohio 44114

*/s/ Russell S. Jones, Jr.* _____
An Attorney for the Defendants