Respondents, because the arbitration clause, and the SPA generally, were procured by fraud. The Respondents' fraud permeates the entire agreement, invalidating the arbitration provision. Moreover, the claims against Respondent Lopez are not subject to arbitration because he was not a party to the SPA. As a result, the claims asserted are not arbitrable, and this matter should remain in court.

## Facts

Euronet is an electronic money transmitter company that offers United States customers electronic-consumer-money-transfer services to locations in Latin America, China, India and the Philippines. In 2006, Euronet expressed interest in acquiring Envios NY and certain of its affiliates involved in the money remittance business serving Latin America and the Dominican Republic, which culminated in a SPA between Euronet and La Nacional.

On January 12, 2007, Euronet entered into the SPA to purchase Envios NY, Envios NJ and AeroCaribe from Respondent Jose Hernandez for $26,000,000. A copy of the SPA is attached as Exhibit 1 to the Amended Petition. Respondent Roberto Lopez was not a party to the SPA. The purchase price of $26 Million was deposited into a Pre-Closing Escrow pursuant to the parties' separate agreement. A copy of the Pre-Closing Escrow Agreement is attached as Exhibit 2 to the Amended Petition. Following deposit of the funds, the parties continued toward completion of the transaction.

The transfer of money from the United States is heavily regulated and subject to potential misuse/abuse by criminals (resulting in criminal and other liability/sanctions to the money remittance company). During the course of the negotiations in 2006 and 2007 Euronet therefore bargained for very broad and specific representations in the

EXHIBIT 1-E

SPA as to the lawfulness of La Nacional's operations and personnel. These representations include:

- None of La Nacional's employees have been convicted of any money laundering offense;
- None of La Nacional's employees were engaged in or conspired to engage in any money laundering transaction;
- La Nacional was in full compliance with the money laundering statutes, including the PATRIOT Act and the Bank Secrecy Act; and
- No agent or employee of La Nacional was under investigation for money laundering.

These clear and unqualified representations of fact given by La Nacional to induce Euronet to purchase the company were false when made and were revealed to Euronet to be so only weeks after the signing of the SPA. On February 6, 2007, twenty-one (21) days after signing the SPA, two La Nacional employees were arrested and charged with money laundering, and search warrants were executed by state and federal authorities at two La Nacional stores and at least four other locations operated by La Nacional agents. *See* Search Warrants attached as Exhibits 3 and 4 to Amended Petition. The execution of the arrest and search warrants were the result of a multi-year investigation into criminal activity at La Nacional stores. *See* Search Warrant affidavits attached as Exhibits 5 and 6 to the Amended Petition. La Nacional failed to inform Euronet about the arrests and raids. Euronet had to learn of these events from public sources.

The events of February 6, 2007 caused Euronet concern about the operations and personnel of La Nacional, which had been represented to be in full compliance with law and not under investigation. *See* SPA at Section 2.13.2 and 2.14. Subsequent investigation heightened Euronet's concerns as to the accuracy of the representations

in the SPA. Specifically, Euronet discovered that in direct contravention of the contractual representations, La Nacional's General Sales Manager (Ramon Corporan) was a convicted felon, having been convicted of conspiracy to launder money and serving more than four years in federal prison prior to his release in 2003. *See* SPA at Section 2.13.2(iv); *United States of America v. Corporan, et. al.*, Case No. 96CR00919.

In addition to having a convicted money launderer responsible for the operations of La Nacional's sales force (*i.e.,* the individuals in the field responsible for those collecting funds), Euronet discovered that Respondent Roberto Lopez, a consultant for La Nacional, and one of the negotiators of the SPA on behalf of La Nacional, had owned Remesas America Oriental ("RAO"), the money remitter that employed Ramon Corporan at the time of his criminal conviction for conspiracy to money launder. RAO was indicted and convicted, along with La Nacional's Sales Manager, for laundering $4.4 million to, among other places, the Dominican Republic. As a result of its federal conviction, RAO was subjected to a $2.2 million forfeiture judgment, and Respondent Lopez was required to surrender his shareholder interests in RAO in partial satisfaction -- effectively shutting down the money laundering enterprise.

In addition to Mr. Corporan, numerous other members of La Nacional's current upper management were associated with the convicted and closed RAO enterprise. These individuals now hold key positions within La Nacional:

- La Nacional's General Sales Manager (Ramon Corporan) was employed by RAO at the time of his conviction and the conviction of RAO;
- The Director of Agent Operations (Frank R. Reyes) at La Nacional served in several roles at RAO and joined La Nacional following the conviction and closure of the RAO money laundering enterprise;
- The Controller of La Nacional (Ana Hernandez) served as the Controller for RAO;

- The President and Chief Executive Officer of La Nacional (Alan H. Friedman) served as the Executive Vice President and President of the parent company of RAO;

- La Nacional's Assistant to the President and Director of Branch Operations (Rosa M. Cruz) was similarly employed by the parent company of RAO; and

- La Nacional's Corporate Internal Auditor (Frank Feliz) was similarly employed by the parent company of RAO.

The information regarding the connection to -- and, in essence, re-creation of -- the indicted and closed RAO enterprise within the La Nacional management structure was not disclosed or discovered until after federal and state agents raided the two La Nacional stores and arrested two La Nacional employees for money laundering. It is unknown how many other RAO associated individuals are currently employed by or associated with La Nacional.

In addition to failing to disclose this information to Euronet, and representing falsely that there was no individual in their employ convicted of any money laundering offense, and that no agent or employee of La Nacional was under investigation for money laundering offenses, La Nacional failed to advise its state regulators (in violation of certain state laws) that it employed a convicted felon. Because of these violations, La Nacional is subject to disciplinary action, including debarment, by certain state regulatory agencies.

As if these revelations were not sufficiently adverse, Euronet also learned of a conspiracy to strip business away from the companies following closing. Respondent Jose Hernandez and his agent, Respondent Roberto Lopez, negotiated the SPA with the intent to first fraudulently induce Euronet to purchase La Nacional at full market value, and then to divert certain key La Nacional sales associates and agents (the revenue generating relationships of the companies) to another entity for their personal

benefit after closing. Respondents Lopez and Jose Hernandez misled Euronet, in furtherance of their business-stripping conspiracy, by misrepresenting the lawfulness of La Nacional's operations and personnel, the value of companies in the future, and by failing to disclose their intent to strip the revenue generating relationships from the company. As a result, the negotiations for the SPA were not at arms' length, but instead were perpetrated for the purpose of consummating a fraudulent scheme.

## III. Law and Analysis

The role of the courts in ruling on a motion to stay arbitration is to determine: (1) whether there is a valid agreement to arbitrate; (2) whether the disputes fall within the scope of the arbitration clause; and (3) whether to stay the balance of the proceedings pending arbitration. *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000); *Schenkers International Forwarders, Inc. v. Meyer*, 164 A.D.2d 541, 542-543 (1st Dept. 1991). Because of potential preemption issues arising under the Federal Arbitration Act, it first must be decided whether these determinations are to be made under federal or state law, and if under state law, which state law applies and which threshold issues are to be resolved by the Court.

### A. The New York arbitration laws apply here because the parties expressly and unequivocally chose to have the SPA governed by New York law, regardless of conflict of laws principles. Under that law, the Court, not the arbitrators, is to consider evidence as to whether the arbitration provision is to be enforced.

As set forth above, the SPA contains a choice-of-law provision, which provides that the SPA "will be governed by and interpreted in accordance with" New York law "without regard to principles of conflict of laws." *See* SPA at Section 11.5. The language of this provision unequivocally demonstrates the parties' intention to have the SPA, including its arbitration

clause, governed by New York law. Accordingly, pursuant to law established by the United States Supreme Court, this Court should apply New York law to this dispute.

**1. The United States Supreme Court holds that an unambiguous "choice-of-law" provision will be enforced to the extent that the provision does not obstruct the purposes and objectives behind the Federal Arbitration Act.**

In *Volt Information Sciences, Inc. v. Board Of Trustees of Leland Stanford Junior University*, 489 U.S. 468 (1989), the United States Supreme Court addressed the issue of whether the Federal Arbitration Act ("FAA") preempts a particular state law chosen by contracting parties pursuant to a choice-of-law provision contained in the agreement. In *Volt*, the plaintiff university and the defendant contractor entered into a contract for services in California and agreed to submit all disputes to arbitration. The contract contained a choice-of-law provision designating "the law of the place where the Project is located" to govern the contract. *Volt*, 489 U.S. at 470. A dispute arose and the contractor filed a demand for arbitration. While this arbitration claim was pending, the university filed claims in state court against the contractor and other parties (with whom it did not have arbitration agreements), and the contractor sought to compel arbitration of those claims pursuant to the contract. *Id.* at 470-471. The university, meanwhile, moved the court to stay the original arbitration proceedings with the contractor, as permitted by the arbitration rules of California. *Id.* at 471-472. The state court refused to compel arbitration of the university's claims against the contractor and stayed the prior, ongoing arbitration of the contractor's claims against the university. *Id.* at 471. The California Court of Appeals affirmed, holding that the parties' inclusion of the choice-of-law provision in their contract evinced intent to be bound by California's rules of arbitration. *Id.* at 471-472.

The United States Supreme Court affirmed this decision. The Supreme Court held, while "due regard must be given to the federal policy favoring arbitration . . . [t]here